[Civ. No. 23626.   Second Dist., Div. Three.   Dec. 14, 1959.]

LORRAINE KOFL, Respondent, v. DAVID O. DUNN et al., Appellants.

Oregon Smith for Appellants.

Jackson C. Bryant for Respondent.

THE COURT.—Plaintiff Mrs. Kofl and defendant David Dunn and his wife owned adjoining lots in Pomona. A controversy arose as to the boundary line between the lots. Mrs. Kofl commenced this action to enjoin Mr. Dunn from interfering with her use and occupancy of her property. Mr. and Mrs. Dunn filed a cross-complaint in which they sought to quiet title to their lot and to obtain an injunction compelling Mrs. Kofl to remove a wall and other structures which al-

legedly encroached on their lot. Judgment was in favor of Mrs. Kofl upon the complaint and cross-complaint. Mr. and Mrs. Dunn appeal from the judgment.

Appellants contend that the evidence was not sufficient to support the findings regarding an agreed boundary line or the findings regarding adverse possession.

The lots owned by Mrs. Kofl and the Dunns were a part of a parcel of approximately 5 acres which was formerly owned by Mr. and Mrs. Gaul. The Gauls acquired the parcel in 1943. At that time the property immediately south of the Gaul property was owned by Mr. and Mrs. Keiser. By deed dated August 23, 1948, and recorded November 8, 1948, the Gauls conveyed a portion of their property (described as the south 53 feet thereof) to Mr. and Mrs. Black. After the Gauls made that deed, they deposited it in escrow. While the escrow was pending, the Blacks caused a survey to be made of the Gaul property, including the property which the Blacks were purchasing. The survey was made by Mr. Adams, a licensed surveyor, and he prepared a survey map of the property. On that map there was a statement as follows:

*"Boundary Line*

"The southerly line of the northerly five acres [Gaul property] . . . has been surveyed by C. D. Adams and marked by the monuments indicated on this map. The northerly and southerly portions of . . . [the Gaul and the Keiser property] are now owned by J. L. Gaul & E. T. Keiser respectively. It is hereby mutually agreed that the location of the southerly line of said northerly five acres now owned by Mr. J. L. Gaul is located as shown on this map."

The statement was dated October 25, 1948, and was signed by the Gauls and the Keisers. The survey map showed that the south line of the Gaul property (which included the portion thereof conveyed to the Blacks) was 222.60 feet from the north line of the Gaul parcel. It thus appears, according to the Adams map, that after the Gauls conveyed the south 53 feet of the property to the Blacks, the south line of the Gaul property (north line of the Black property) was 169.60 feet from the north line of the Gaul property.

After the Blacks acquired the south 53 feet (of the Gaul property), as shown by the Adams map, they built a house and a garage thereon. Mr. Black testified that he "accepted the four points of the [Adams] survey"; he had resided on the property ever since the escrow closed; he had a fence on part of the north boundary of his property.

By deed dated November 1, 1948, and recorded January 11, 1949, the Gauls conveyed another portion of their property (being 65 feet adjoining the north side of the Black property) to plaintiff (Mrs. Kofl) and her husband. It thus appears, according to the Adams map, that after the Gauls conveyed the 65 feet (adjoining the Black property) to the Kofls, the south line of the Gaul property (which was then the north line of the Kofl property) was 104.60 feet from the north line of the Gaul property.

After the Kofls acquired the said 65 feet (of the Gaul property), as shown by the Adams map, they built a house and a garage thereon. The house was completed in January, 1950, and the garage was completed in 1951. About January, 1953, after the death of Mr. Kofl, the plaintiff (Mrs. Kofl) built a concrete-block wall south of, and adjacent to, the north boundary line of her property (the line as shown by the Adams map).

In April, 1956, the Gauls conveyed to defendant Dunn and his wife the remainder of the property which the Gauls had purchased in 1943 (that is, they conveyed to the Dunns all the original Gaul property except the 53 feet and the 65 feet which had been conveyed to the Blacks and the Kofls).

About May, 1956, the Dunns caused a survey to be made of the property which the Gauls had acquired in 1943. The survey was made by Treadwell Engineering Corporation, and in September, 1956, that corporation prepared a survey map of the property. As shown by that map, the south boundary of the original Gaul property was 230.31 feet from the north boundary of the original Gaul property; the south boundary of the Dunn property (that is, the Dunn-Kofl line) was 112.31 feet from the north boundary of the Gaul property (now the Dunn property); the Kofl block wall was approximately 9 feet north of the Dunn-Kofl boundary line (that is, the wall was on the Dunn property); the Kofl house and garage extended approximately 6 feet north of the Dunn-Kofl line (that is, they extended about 6 feet onto the Dunn property).

It thus appears (1), according to the Treadwell survey map, that the south boundary of the original Gaul property was 230.31 feet from the north boundary of the Gaul property; and (2), according to the Adams survey map, the south boundary of the original Gaul property was 222.60 feet from the north boundary of the Gaul property. In other words, according to the Treadwell map, the south boundary line of the original Gaul property was 7.71 feet farther south than

the south boundary line of that property, according to the Adams map. The Treadwell map shows that the survey measurements were made from the curb line of the street. (Street was east of Gaul property.) The Adams map shows that the survey measurements were made from the middle of the street. Since the area of the original Gaul property was 5 acres, and since the north and west boundaries were not in dispute, it appears that if the east boundary of the property is the curb line of the street, instead of the middle of the street, the south boundary would extend farther to the south than it would extend if the east boundary line were the middle of the street.

The deeds from the Gauls to the Blacks, the Kofls, and the Dunns recited that the depth of the lots (from east to west) was measured from the westerly line of the street.

Defendant David Dunn made a demand that plaintiff (Mrs. Kofl) remove (1) the wall which, according to the Treadwell survey, was upon the Dunn property, and (2) the portions of her garage and house which, as shown by the survey, encroached upon the Dunn property. Plaintiff refused to remove those structures. Thereafter David Dunn attempted to undermine and destroy the wall, and he threatened to destroy the portions of the house and garage, which he contended, encroached upon the Dunn property.

On September 20, 1956, plaintiff commenced this action to quiet title to her lot and to enjoin David Dunn from interfering with her use and occupancy of the lot. Mr. and Mrs. Dunn filed a cross-complaint in which they sought to quiet title to their lot; to obtain an injunction compelling Mrs. Kofl to remove the wall and other structures which allegedly encroached on their lot; and to recover damages.

The court found, as follows: On October 25, 1948, the Gauls and the Keisers entered into a written agreement fixing the boundary line between the real properties then owned by them. The agreement was incorporated in the survey map prepared by Mr. Adams. The agreement was entered into pursuant to a dispute between said parties. The boundary was marked by Mr. Adams with iron stakes, and it was ''acquiesced in'' for more than five years. Prior to the conveyance by the Gauls to defendants (apparently meaning the Dunns—the only defendant was David Dunn), the north boundary of the Kofl property was marked by a block wall and fence which was accepted by the Gauls as the true line for more than five years prior to the conveyance to defendants (Dunns). The Gauls

pointed out to defendants the wall and fence as the south boundary of the land that defendants were purchasing. Plaintiff has paid taxes "on the land in question" for more than five years. The boundary line between the plaintiff's (Mrs. Kofl's) property and the defendants' (Dunns') property is the north side of the concrete wall and the prolongation thereof. There is no encroachment by plaintiff on any real property of defendants. (Since David Dunn is the only defendant, it will be assumed that "defendants," as used in the findings, refers to Mr. and Mrs. Dunn.)

The judgment quieted plaintiff's title to the 65 feet she purchased from the Gauls, and it enjoined defendant David Dunn from interfering with the use and occupation by plaintiff of any of the real property occupied by plaintiff and lying southerly of the block wall and the easterly and westerly prolongations thereof.

Appellants argue that the boundary line agreement was "void" as to them for the reasons that: (1) it was unrecorded and they did not acquire knowledge of it until after the recording of their deed; (2) it was not based upon an uncertainty as to the location of the south line of the 5 acres (original Gaul property); and (3) it did not contain operative words of conveyance.

In *Ernie* v. *Trinity Lutheran Church*, 51 Cal.2d 702 [336 P.2d 525], it was said, at page 707: "The requirements of proof necessary to establish a title by agreed boundary are well settled by the decisions in this state. [Citations.] The doctrine requires that there be an uncertainty as to the true boundary line, an agreement between the coterminous owners fixing the line, an acceptance and acquiescence in the line so fixed for a period equal to the statute of limitations or under such circumstances that substantial loss would be caused by a change of its position. It is not required that the true location be absolutely unascertainable [citations]; that an accurate survey from the calls in the deed is possible [citation], or that the uncertainty should appear from the deeds [citation]." It was further said therein, at pages 708 and 709, in quoting from another case: "It is stated by the authorities that the line so agreed on becomes in legal effect the true line, that the agreement as to the line may be in parol and that it does not operate to convey title to the land which may lie between the agreed line and the true line, but that it fixes the line itself and the description carries title up to the agreed line, regardless of its accuracy . . . that 'the division

line when thus established, attaches itself to the deeds of the respective parties, and simply defines, not adds to, the lands described in each deed,' and that if more is thus given to one than the calls of his deed actually requires, he 'holds the excess by the same tenure that he holds the main body of his lands.' "

In *Needham* v. *Collamer*, 94 Cal.App.2d 609 [211 P.2d 308] it was stated (p. 612) that the boundary "line so agreed upon attaches to the deeds of the original parties and is binding on them and their successors by subsequent deeds."

Furthermore, in the present case, Mr. Gaul testified that prior to the sale by the Gauls to the Dunns, he and Mr. Dunn visited the property which the Dunns purchased; he told Mr. Dunn that the Kofl wall was the south line of the property. Mr. Dunn testified that he saw the wall, and he "did not think that it [the property he was purchasing] extended under this concrete block wall."

As above stated, appellants argue that the boundary agreement was not based upon an uncertainty. The testimony of Mr. Adams and Mr. Gaul indicates that there was uncertainty. Mr. Adams testified as follows: "The southeast corner [of the Gaul property] was one that was difficult to ascertain because of the fact that this area at the time was in orange groves. In taping off the area as given on the tax bills and other records, we found that the distance from the north line of this parcel extended to a point which was southerly of the first row of trees occupied by Mr. G. S. Kaiser on the portion immediately south of this so called five acre tract and so, by agreement with Mr. Gaul, owner of the five acre parcel and Mr. Kaiser which is indicated on this map [Adams map], it was agreed by them that this point located the southeast corner and would be accepted by them as the property line. Mr. Kaiser, for many years, had tilled this area and had used the land above the northerly trees and this point was determined by agreement as to the usage in a settlement of this matter of where they had turned around and used the land."

Mr. Adams testified further that there was "no effort" to survey the exact location of the south line of the Gaul property; that the "measurement was made of the distance of approximately, as I [Adams] remember it, 234 feet as set forth in the tax bills and it was found to be southerly of this first row of trees of Mr. Kaiser's, and, after a certain amount of investigation, it was found that there was disagreement

in the measurements between this property and San Bernardino Avenue which lies to the south of it and therefore we, after Mr. Gaul and Mr. Kaiser agreed to the location of the south line of the Gaul property, then, I measured that distance and recorded it on the map and set the monuments as indicated.''

Mr. Adams testified further that the agreement between the Gauls and the Keisers ''came about by meeting of Mr. Kaiser and Mr. Gaul and myself [Adams] at the disputed point and there a question arose whether it was farther south or where it should be and they mutually agreed as stated that line would be established where it is indicated on the Exhibit [the Adams map].''

Mr. Gaul testified as follows: ''At the time the survey [Adams survey] was made, it was discovered that the south boundary line of the property that I owned at that time was below the north row of trees owned by Mr. Kaiser. He objected because it would interfere with his trees. . . . Therefore, he asked that we move the line eight feet north to give him ingress and egress. That is the reason for the agreement.''

Whether there was a dispute, and whether there was uncertainty, as to the location of the boundary line between the Gaul and Keiser properties, were questions of fact for the determination of the trial judge. It could reasonably be inferred from the evidence that there was such a dispute and uncertainty.

As above stated, after the execution of the boundary agreement between the Gauls and the Keisers in 1948, the Blacks went into possession of the 53 feet immediately north of the agreed line, and they built a house and garage on that property, and they built a fence on the north line. After plaintiff and her husband (the Kofls) purchased the 65 feet in 1948, they went into possession of the 65 feet immediately north of the Black property, and they built a house and garage thereon. About four years after said purchase, Mrs. Kofl built the block wall adjacent to the north boundary line. Section 318 of the Code of Civil Procedure provides: ''No action for the recovery of real property, or for the recovery of the possession thereof, can be maintained, unless it appear that the plaintiff, his ancestor, predecessor, or grantor, was seised or possessed of the property in question, within five years before the commencement of the action.'' The present action was commenced in 1956, which was more than five years after the date of the agreement between the Gauls and the Keisers.

As above stated, Mrs. Kofl's wall and portions of her house and garage are on the property which is in controversy. A change of the position of the line from the place which she claims is the true line to the place which the Dunns claim is the true line, would result in a substantial loss to Mrs. Kofl.

The evidence was sufficient to support the findings regarding an agreed property line.

In view of that conclusion, it is not necessary to determine whether the evidence was sufficient to support the findings regarding adverse possession.

Appellants contend that the court erred in sustaining plaintiff's objections to offers in evidence of an advertisement, a deposit receipt, and escrow instructions, regarding the sale by the Gauls to the Dunns. Appellants argue that such evidence was admissible to show that the Gauls advertised the property, and described the property in the receipt and escrow, as being 114 feet in width (measured from the north line of the Gaul property) ; and that such evidence was material as tending to prove that the Gauls did not accept the block wall (which was 104.60 feet from the north line of the Gaul property) as the true boundary line. Such advertising and description were not material on the question as to whether the Gauls and the Keisers had made an agreement as to the location of the boundary line between their properties. If the Gauls overestimated the width of their property, in the negotiations with the Dunns, that was a matter which might be material as between the Gauls and the Dunns. The court did not err in sustaining the objections.

Appellants' other contentions regarding the admissibility of evidence do not merit discussion. Some of those contentions were to the effect that the court erred in sustaining objections to questions as to (1) whether there was a mistake in a deed, (2) what the "position" of Mr. Gaul was with reference to the cause of the alleged encroachment, and (3) what Mr. Adams considered was the accepted line before he made the survey. The contentions regarding admissibility of evidence are not sustainable.

The judgment is affirmed.

A petition for a rehearing was denied January 13, 1960, and appellants' petition for a hearing by the Supreme Court was denied February 10, 1960.